THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
    :
    v.    :  **3:20-CR-143**
    :  **(JUDGE MARIANI)**
DELVIN HUTCHINSON,    :
    :
        Defendant.    :

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Delvin Hutchinson is charged with two counts of making false statements during the purchase of firearms from a federally licensed firearms dealer in violation of 18 U.S.C. § 922(a)(6). (Doc. 1 at 1-3). Through the instant Motion to Suppress (Doc. 65), Defendant seeks to suppress "all evidence obtained by the Government in an interrogation of Defendant by A.T.F. Agents on April 11, 2019, in violation of his rights under Amendment V of the United States Constitution against compelled self-incrimination and Amendment VI to have assistance of counsel." (Doc. 66 at 1).[1] The Court held an evidentiary hearing on June 22, 2022. For the reasons that follow, the Court will deny Defendant's Motion to Suppress (Doc. 65).

---

[1] In his Motion, Defendant claims that, in addition to the agents violating his Fifth Amendment right against self-incrimination, the agents violated his Sixth Amendment right to counsel. (Doc. 65 at ¶ 8). However, the Sixth Amendment is not implicated here. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (explaining that one's Sixth Amendment right to counsel "does not attach until a prosecution is commences, that is 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (quotations and citations omitted)). Further, Defendant provides no law or substantive argument to support his claim that his Sixth Amendment right to counsel was violated; thus Defendant abandoned this argument. (*See* Doc. 66; Doc. 83).

## II. STATEMENT OF FACTS

As this Motion to Suppress relates only to the issue of whether Defendant was in custody for purposes of *Miranda* during the interview with Agent Smart and Agent Jacobi, the Court only recites facts relevant to this specific issue.

Agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") discovered that Defendant purchased seven firearms within a three-week period in March 2019.  (Doc. 66 at 2; Doc. 84 at 2; Doc. 78 at 5).  On April 11, 2019, ATF Agents Michael Jacobi and Davon Smart arrived at Defendant's home to inquire about his firearm purchases and to determine whether these transactions were "straw purchases."  (Doc. 78 at 5; *see also* Interview Transcript).[2]  When they arrived at his house, Defendant's stepfather answered the door and, after identifying themselves as agents, they asked to speak with Defendant.  (Doc. 78 at 8, 53-54).  Defendant came to the door and the agents identified themselves as ATF agents and "told him, briefly, what we would like to speak with him about."  (*Id.* at 8, 54).

Defendant explained that he did not want to talk to the agents in his house.  (*Id.*). The weather was "cooler" and "windy," which made it "difficult to just stand around and have a conversation," and the family dog at Defendant's residence was "energetic" and caused a

_____

[2] Agent Jacobi explained that a "[s]traw purchase consists of somebody fictitiously purchasing a firearm under the guise of that it is for themselves, when it's, in fact, for somebody else, who is a prohibited person from possessing them."  (Doc. 78 at 5).

slight "disturbance." (*Id.* at 9, 53-54).  Ultimately, Defendant spoke to the agents inside of their vehicle, as it was a "private setting" and shielded from both the weather and the dog. (*Id.* at 9-54).[3]  The agents' car was "[p]arked on the public street near the end of the driveway leading to [Defendant's] residence," did not have any law enforcement markings on it, did not have a prisoner transport "cage," and was unlocked for the entire interview. (Doc. 78 at 10, 14-15, 51, 55).  Defendant sat in the front passenger seat, Agent Smart sat in the driver's seat, and Agent Jacobi sat in the rear passenger seat.  (Doc. 78 at 11). Defendant was not physically prevented from leaving the agents' car through the use of restraints, locks, or other barriers.  (*Id.* at 10, 14-15, 54-56).  Defendant himself was not physically touched by the agents, with the exception of a handshake, and was not forced into the vehicle or placed in handcuffs at any point.  (*Id.*).

After Agent Smart, Agent Jacobi, and Defendant got into the vehicle, Agent Jacobi activated a person digital recorder that recorded the agents' interview with Defendant. (Doc. 78 at 13).[4]  Prior to entering the vehicle and activating the recording device, Agent Jacobi testified that he "indicated that [Defendant] was not under arrest and that he was free to leave." (*Id.* at 11).

At first, Defendant had a casual social conversation with the agents and spoke about friends, employment, and Defendant's future plans, and Defendant can be heard laughing.

---

[3] The interview taking place in the agents' car is discussed in greater detail below.
[4] Any conversation that took place prior to the interview in the vehicle is not captured on the recording.

(Interview Transcript at 1-9).  During this preliminary phase of the interview, Defendant's

mother came out of her house and approached the vehicle.  Agent Jacobi got out of the

vehicle to speak with her, and their conversation can be heard on the interview recording.

(*Id.* at 6-8).  Agent Jacobi explained that Defendant is "not in any trouble, we're not taking

him.  We're just sitting out here talking.  He didn't want us to come in the house, so we're

just sitting out here in the car talking so we're not (U/I)."  (*Id.*).[5]

   After the conversation with Defendant's mother, Agent Jacobi reentered the vehicle

and both agents began to ask Defendant questions regarding his firearms purchases.  The

interview proceeded in a professional and calm tone as the agents asked Defendant

questions about the firearms, such as why he purchased them and where they were

located.  (*See* Doc. 78 at 14, 21 (Agent Jacobi describing the interview as "cordial" and

notes that there is a "[v]ery calm demeanor on everyone's behalf"); *see generally* Interview

Transcript).  Roughly halfway through the interview, the agents' tone shifted as they

expressed skepticism and disbelief at Defendant's version of events.  (Doc. 78 at 43-44;

Interview Transcript at 31-43).  When asked about his tone at this point of the interview on

cross-examination, Agent Jacobi agreed that his "voice became louder" and stated, "I'm

raising my voice in exclamation to confirm I didn't believe what he was saying."  (Doc. 78 at

43-44).  During this portion of the interview, the agents reiterate to Defendant that he is not

---

[5] (U/I) is shorthand for "unintelligible."  (*See generally* Interview Transcript).

under arrest, they are "not about to trick you and arrest you," and "You're going back in the house, no matter what. We driving off, no matter what." (Interview Transcript at 33).

In all, the interview lasted approximately one hour and forty-six seconds and ended at 12:05 p.m. (Doc. 78 at 31-32). At the end of the interview, Defendant opened the car door without assistance and walked back into his house. (Doc. 78 at 32, 57 ("In the hour, we ended the interview, Delvin Hutchinson was free to leave, we never told me he wasn't, so he got out the front of the car and walked home.").

### III. ANALYSIS

The Fifth Amendment to the United States Constitution provides, "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461 (1996)). In an effort to ensure these rights are protected, the United States Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as "*Miranda* rights" or "*Miranda* warnings," a defendant in police custody

must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the

5

right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Police are only required to provide warnings when a person is subjected to custodial interrogation, or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original); *United States v. Savage*, 677 F.Supp.2d 756, 763 (E.D.Pa. 2009) ("No *Miranda* warning is required absent a 'custodial interrogation.'"); *United States v. Willaman*, 537 F.3d 354, 359 (3d Cir. 2006) ("*Miranda*, of course, requires warnings only when the person the police are questioning is in custody.").

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted).  The focus of the inquiry is "upon the perceptions of the suspect, rather than the intent of the police." *Id.*; *see also Stansbury v. California*, 511 U.S. 318, 323 (1994)

6

(explaining that the custody inquiry "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

Here, there is no dispute that Defendant was not advised of his *Miranda* rights prior to the ATF agents' questioning, (Doc. 78 at 35-36, 50-52; *see generally* ATF Interview Transcript), and it appears that the parties do not dispute that the interview that took place between Defendant and the ATF agents satisfied the interrogation prong of the custodial interrogation process. Thus, the issue before the Court is whether Defendant was in custody when he was interrogated by ATF agents on April 11, 2019. (*See* Doc. 78 at 50 ("Q. So the issue is whether he was in custody; correct? A. Correct.")).

A person is in custody for purposes of *Miranda* when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "It is also established beyond doubt that a custodial interrogation may occur outside the police station." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citing *Orozco v. Texas*, 394 U.S. 324 (1969)); *see also Howes v. Fields*, 565 U.S. 499, 508-09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). "Where, as here, the individual has not been openly arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would

7

not have heeded a request to depart or to allow the suspect to do so.'" *Id.* (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)); *see also Willaman*, 437 F.3d at 359.

Courts must consider whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Third Circuit has identified five factors for a court to consider when determining whether a person is in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60; *see also United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).[6]

---

[6] In *Howes v. Fields*, 565 U.S. 499 (2012), the Supreme Court listed a series of factors for courts to consider when evaluating whether a person is in custody:

> And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury, supra*, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, *see Shatzer, supra*, at 112-114, 130 S.Ct., at 1223-1226, its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437-438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, *see Mathiason, supra*, at 495 U.S., 97 S.Ct. 711; *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Stansbury, supra*, at 325, 114 S.Ct. 1526, the presence or absence of physical restrains during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, *see California v. Beheler*, 463 U.S. 1121, 1122-1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam*).

*Howes*, 565 U.S. at 509 (2012).

As discussed above, the subject of the instant Motion centers on whether Defendant was in custody at the time of the ATF agents' interrogation, thereby requiring the agents to advise Defendant of his *Miranda* rights.  Because Defendant was not placed under formal arrest (Doc. 78 at 11 ("I indicated that he was not under arrest and that he was free to leave.")), the Court must employ the five *Willaman* factors, in addition to any other relevant factors, to determine whether Defendant was in custody.

The first *Willaman* factor considers whether the officers told the suspect he was under arrest or free to leave.  Agent Jacobi and Agent Smart testified that they told Defendant that he was not under arrest and was free to leave, which is confirmed by the audio recording.  (Doc. 78 at 11, 57; *see, e.g.,* Interview Transcript at 34, 47); *see also United States v. Ingino*, 423 F.Supp.3d 108, 111-12 (M.D.Pa. 2019) (holding that Defendant was not in custody because, *inter alia*, the officers that interviewed the defendant "explained to Ingino that he was free to leave and would be going home that day" and "repeated that sentiment twice more on the recording, during questioning"); *United States v. Ramos-Colon*, 2021 WL 2255899, at *6 (E.D.Pa. June 3, 2021) ("There is no evidence of record whatsoever that Defendant was told that she was required to speak with Trooper Ford or that she wasn't free to leave.").  The agents told Defendant:

> **DAVON:** We're not about to trick you and arrest you, bruh.  That's not happening.
>
> **MIKE:** No, that's not happening.
>
> **DAVON:** So, we already told your mom.  We ain't lie to your mom.  You're going back in the house, no matter what.  We driving off, no matter what.

(Interview Transcript at 34).  Agent Jacobi also reassured Defendant's mom that "[h]e's not

in any trouble, we're not taking him," within earshot of Defendant.[7]  (Interview Transcript at

6).  Given these circumstances, a reasonable person in Defendant's position would have felt

free to leave.  Thus, this factor weighs against a finding of custody.

The second factor enumerated in *Willaman* considers the location and physical

surroundings of the interrogation.  The interrogation took place inside the ATF agents'

vehicle, which did not have a prisoner transport cage, remained unlocked for the duration of

the questioning, and did not have any law enforcement markings on it.  (Doc. 78 at 10, 14-

15, 51, 55).  Defendant was not physically prevented from leaving the agents' car through

the use of restraints, locks, or other barriers.  (Doc. 78 at 10, 14-15, 54-56); *see United

States v. Ferrebee*, 2018 WL 2734844, at \*5 (M.D.Pa. June 7, 2018) (holding the defendant

was not in custody for purposes of *Miranda* because, among other things, "no evidence

suggests that there were barriers preventing the defendant from leaving the room at any

point" and "[n]o evidence indicates that the agents … used physical restraints").  Defendant

sat in the front passenger seat, Agent Smart sat in the driver's seat, and Agent Jacobi sat in

the rear passenger seat.  (Doc. 78 at 11); *see United States v. Michalik*, 5 F.4th 583, 588

(5th Cir. 2021) (finding that the location of the questioning suggested the defendant was not

---

[7] Agent Jacobi's conversation with Defendant's mother is captured on the interview recording.  (Doc. 78 at 15-16; Interview Transcript at 6-8).

in custody because he "sat in the passenger-side front seat of a police car on the street near his house").

Defendant declined to speak to the agents inside of the home he shared with his parents because he did not want his mom "to know about [his] business," (*id.* at 65), a choice the agents respected, and Defendant agreed to speak with the agents inside of their vehicle. (*Id.* at 9, 54 ("So we offered to, basically, speak inside our car, it would be a private setting, he was willing to come and speak inside the vehicle.")).[8]  The vehicle was "parked on the public street near the end of the driveway leading to [Defendant's] residence," which was in view of Defendant's mother form inside the home and "subject to public scrutiny." (Doc. 78 at 10); *see United States v. Wright*, 777 F.3d 769, 771, 777 (5th Cir. 2015) (noting that the interrogation that took place in a police officer's vehicle that was "subject to public scrutiny" while it was parked about thirty feet from the defendant's house); *see also Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) ("The exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse.").

---

[8] The interview took place inside of the agents' vehicle instead of outside because the weather was "windy" and "cooler," making it "difficult to just stand around and have a conversation."  (Doc. 78 at 9). Furthermore, there was a "larger breed, energetic dog" at Defendant's residence that caused a "disturbance." (*Id.*).  Agent Jacobi testified, "When Mr. Hutchinson declined to speak in the residence, as I said, it was not particularly suitable to talk outside with the weather and the family dog, so I offered our vehicle to speak in." (*Id.*).  Agent Smart confirmed Agent Jacobi's testimony regarding why the interview took place in their vehicle. (*Id.* at 53-54).

The potentially coercive nature of an interrogation that takes place in a government vehicle was tempered by the fact that Defendant effectively chose to go through with the questioning inside the vehicle instead of inside his home, the vehicle was in view of the public and his family from inside his home, and the vehicle itself was not outfitted with intimidating features and was unlocked for the duration of the interrogation. Defendant was not restrained or frisked before getting into the vehicle, nor was he locked inside of or physically prevented from exiting the vehicle. Therefore, the location and physical surroundings of the interview suggest Defendant was not in custody.

The third factor requires the Court to consider the length of the interrogation. Here, the recorded interrogation lasted approximately one hour and forty-six seconds. (Doc. 78 at 31-32). The Third Circuit has held that interrogations lasting anywhere between ninety minutes to seven hours can be characterized as non-custodial. *United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) (collecting cases). The interrogation in this case was relatively short, suggesting Defendant was not in custody.

The fourth factor requires the Court to determine whether law enforcement used "coercive tactics" that created a custodial setting. Only two agents, Agent Jacobi and Agent Smart, interviewed Defendant in the early afternoon between approximately 11:00 a.m. and 12:05 p.m. *United States v. Sater*, 477 F.Supp.3d 372, 381 (M.D.Pa. 2020) (finding that Defendant was not in custody for purposes of *Miranda* when, *inter alia*, only two agents interviewed the defendant at his home around noon). As discussed above, Defendant was

12

not handcuffed, physically restrained, frisked, or touched (with the exception of a handshake), and the vehicle was unlocked for the duration of the interview.  (Doc. 78 at 10, 14-15, 51, 54-56).  The agents did not draw or display their weapons, and they testified that their weapons were not even visible during the questioning.  (*Id.* at 17, 55); *compare United States v. McNeil*, 416 F. App'x 227, 229 (3d Cir. 2011) (suspect was not in custody where officers' weapons were never drawn); *with United States v. Faultz*, 812 F.Supp.2d 570, 619 (D.N.J. 2011) (suspect was in custody where agents entered with firearms drawn and continued to detain him with holstered, yet visible, weapons).

The agents honored Defendant's request to speak outside of the home he shared with his parents, and both Agent Jacobi and Agent Smart testified that he willingly agreed to speak with them in their vehicle because the weather and the family dog made it difficult to speak outside.  (Doc. 78 at 9, 53-54).  The only request that the agents did not honor was Defendant's offer to "get back to you guys" with information about the guns when the agents asked him to "put everything out there and be real and be straight."  (Interview Transcript at 31-32); *see Sater*, 477 F.Supp.3d at 381 (2020) (finding that the defendant was not in custody and noted "[t]he only request that [the agents] did not honor was when [the defendant] asked them to come back in the afternoon").  When asked about this statement at the Suppression Hearing, Defendant testified, "I was trying to leave, but, now I felt like I was stuck and cornered into a situation" and he felt "I had to stay here and finish this statement and I couldn't leave."  (Doc. 78 at 62).  Defendant claims, "I had my hands on the

13

door trying to open the door" and "held the handle" to open the door, but "that's when Mike

suggested that I can walk around the car, but that I couldn't leave." (*Id.* at 63).

Upon review of the interview recording and transcript, the Court finds that, contrary

to Defendant's testimony, Agent Jacobi did not "suggest[ ]" that Defendant could not leave

the encounter.  The full exchange to which Defendant refers, beginning with Defendant's

statement that he can "get back" to the agents, reads as follows:

> **DH:** I gotcha.  I definitely can get back to you guys.
>
> **MIKE:** No, man.  We're here now, bro.  We missed you last time, we're here now.
>
> **DH:** I ain't even know you came (U/I).
>
> **MIKE:** Yeah, we talked to your step pops before.  And it's a haul for us, bro.  We work out already, man.
>
> **DAVON:** Yeah.
>
> **MIKE:** So, we drive a minute up here, man.  So, we're right here now.  We put it all out there.  I know you got some thinking to do, but I also know you know what's right, and what you did, and what the other party did.  And right now, we're here to talk about it.  So, I mean, whether you need to take a deep breath, you know, walk around the car for a minute or whatnot, but I mean, right now is your chance to come with it.  There is no come back next week, and we can straighten it out, you know?
>
> **DAVON:** Because you know what happened.  So, I mean the only thing I would say we'll be waiting for if you was trying to come up with another story.  But it's like, you know what happened.  It's easy to tell the truth.  That's easy, you know what happened.  Right now, you know what happened.  You just bought guns.  You know what happened.
>
> **MIKE:** We didn't catch you a year down – year down the road.  This was just two weeks ago, you know?  So, I mean, right now, dude, it's – that's kind of

14

where we're at, you know.  And you know, we appreciate your time and you coming out here, but this is kind of the situation we're in.  So, you either come with it and, you know, that's cool, and we all walk – you know, we handshake and everyone respects everybody, and we can look each other in the face.  Or you know, you kind of walk back inside knowing that you fed us a lie and BS and, you know, the next time we come it's gonna be a different story.

**DAVON:** We're not about to trick you and arrest you, bruh.  That's not happening.

**MIKE:** No, that's not happening.

**DAVON:** So, we already told your mom.  We ain't lie to your mom.  You're going back in the house, no matter what.  We driving off, no matter what.

(Doc. 78 at 31-33).

The agents did not suggest that Defendant could not leave; instead, Defendant was faced with a choice to continue the interview and tell the truth, or to exit the vehicle and walk back into his house, effectively ending the interview.  Indeed, Agent Jacobi explained these two choices to Defendant, saying Defendant could "come with it" and tell the truth, or he could "kind of walk back inside knowing that you fed us a lie and BS[.]"  (*Id.* at 32-33).  Agent Jacobi also offers Defendant the opportunity to "walk around the car for minute," which indicates he could exit the vehicle and leave on his own volition.  (*Id.* at 32).  Defendant had a choice to make, and he chose to stay in the car and continue the interview.  At no point did he express an explicit desire to leave,[9] nor did he open the unlocked car

---

[9] Defendant testified that his statement "I definitely can get back to you guys" was an expression of his desire to leave and he testified that he had his "hands on the door trying to open the door" to exit the vehicle.  (Doc. 78 at 62-63).  The Court finds this statement an ambiguous expression of his desire to leave, at best.  Defendant does not clearly and explicitly ask to leave or end the interview, nor did he actually open the door to leave, which was unlocked during the entire interview.

door and walk back into his home.  The fact that Defendant may regret his choice now that

he is charged with federal firearms offenses does not change the *Miranda* inquiry

undertaken by this Court to determine whether Defendant was subject to a custodial

interrogation.  Defendant was not "deprived of his freedom of action in any significant way."

*Miranda*, 384 U.S. at 444.

Finally, the recording shows that for approximately the first half hour of the interview,

the agents used professional and calm, but serious, tones of voice.  (*See generally* Interview

Recording).  During this portion of the interview, the agents and Defendant can be heard

laughing multiple times.  (*Id.*; Doc. 78 at 14, 19, 21, 31, 57).  About halfway through the

interview, however, Agent Jacobi can be heard using an elevated tone of voice when asking

Defendant about his statement that he did not know how to report his gun as stolen and

confronting Defendant about his version of events.  (Interview Transcript at 31-43; Doc. 78 at

43-44).  Agent Jacobi agreed that his "voice became louder" and he testified, "I'm raising my

voice in exclamation to confirm I didn't believe what he was saying."  (Doc. 78 at 43-44).

Viewed in isolation, the agents' heightened skepticism and more confrontational questioning

during the middle portion of the interview does weigh in favor of finding that Defendant was

subject to a custodial interview.  However, as described in this analysis of the fourth *Willaman*

factor, the agents' tactics during the interview, on the whole, were not "coercive."

In sum, the Court finds that the agents did not use coercive tactics during their

interview with Defendant.  Thus, the Court determines that the fourth factor weighs against

a finding of custody because a reasonable person in this situation would feel free to terminate the encounter and leave.

The final *Willaman* factor considers whether the individual voluntarily submitted to questioning. When Agent Jacobi and Agent Smart arrived at Defendant's residence, they identified themselves to his stepfather and explained that they wanted to speak with Defendant. (Doc. 78 at 8). When Defendant arrived at the door, the agents again identified themselves and told Defendant they wanted to speak to him about his recent firearm purchases. (*Id.* at 8-9, 54, 61). As discussed above, Defendant stated he did not want to talk to them inside his house (*id.* at 61), but he did go into the agents' vehicle to speak with them. Both Agent Jacobi and Agent Smart testified that Defendant entered the car on his own and he was not "touched in any manner, whatsoever, prior to getting in the vehicle or while he was in the vehicle," except for a handshake. (*Id.* at 9-10, 15, 54). Agent Smart specifically testified that "he was willing to come and speak inside the vehicle," (*id.* at 54), and Agent Jacobi said he was not "force[d] … to get in the vehicle, in any manner" (*id.* at 10).

Defendant disagreed with the agents' version of events. He testified:

**Q.** Just tell us your first instance of any communication on April 11, with either agent, and if you would, just pick us up where that occurred and what was said.

**A.** In the beginning when I opened my door and came to them and they identified themselves, they asked to speak with me and answer some questions. They identified themselves and the ATF, and they wanted to speak to me inside my house. And I said, at this moment in time, I would not like to speak to you inside my house, can I speak to you some other time? Do you have a card or anything?

They told me it was either you talk to us now or we're going to get a warrant for your arrest and you'll speak to us then.

**Q.** And, then, as a result of hearing that, what happened next?

**A.** I became fearful, and I went with them to speak with them in the car.

(Doc. 78 at 60-61).

On cross-examination, the Government challenged Defendant's allegation that the

agents threatened to return with an arrest warrant if he did not speak to them:

**Q.** You said, I was trying to leave.  And in all the conversation we heard this afternoon, never once did you tell either agent that you wanted to leave.  You didn't tell them, did you?

**A.** I didn't feel I had the choice.

**Q.** My question is, You didn't tell them?

**A.** No, because they told me I had to stay there and talk to them.

**Q.** When they came to the door of the house, you could have just closed the door and said, I don't want to talk to you.

**A.** I did, and they told me, either I talk to them now or they're going to get an actual warrant for my arrest and then I'm going to talk to them then.

**Q.** Even though they didn't get an actual warrant for more then a year later?

**A.** Repeat that.  I didn't hear what you said.

**Q.** Even though they didn't get an actual warrant for your arrest until more than a year after this conversation on April 11?

**A.** Yes, but I don't work for the ATF, I don't know what protocol is, so I don't know anything.

(Doc. 78 at 65-66).

The Court finds that nothing in the record corroborates Defendant's claim that the agents told him they would come back with a warrant for his arrest if he did not answer their questions. The first time the Court was made aware of Defendant's assertion that the agents threatened to get an arrest warrant was during Defendant's testimony at the Suppression Hearing, as Defendant did not include this allegation in his Motion to Suppress or brief in support thereof. (*See generally* Doc. 65; Doc. 66). Furthermore, Defendant and Agent Smart were engaged in a social conversation, discussing employment, living arrangements, and Defendant's plans for the future at the beginning of the recorded interview. (*See* Interview Transcript at 1-9). Additionally, Defendant can be heard laughing at many points throughout the interview, including the beginning. Defendant's demeanor, especially at the beginning of the interview, does not sound like an individual who was "fearful" or felt compelled to speak with the agents. Thus, the Court finds that Defendant's allegation that the agents threatened Defendant with an arrest warrant if he did not speak to them is not credible.

The Court finds that Defendant voluntarily left his home, followed agents to their vehicle, and entered the vehicle entirely on his own with the "understanding that questioning would ensue." *See United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) ("In determining whether suspects were 'in custody' for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers *understanding*

*that questioning would ensue.*" (citing *Beheler*, 463 U.S. 1121, 1125)); *see also United*

*States v. Jacobs*, 431 F.3d 99, 106 (3d Cir. 2005) (citing *Kim*, 292 F.3d at 974)).

The Court finds that Defendant willingly entered the agents' car to speak with them

regarding his firearms purchases. Defendant agreed to speak with the agents in their

vehicle instead of in his home, and he was not prevented from leaving the vehicle through

the use of door locks or physical restraints at any point. Therefore, the fifth *Willaman* factor

weighs in against a finding of custody.

In addition to the *Willaman* factors, courts can consider other factors to determine

whether an individual was in custody for purposes of *Miranda*, such as

> the officers' belief about a suspect's culpability and whether the officers shared
> their belief with the suspect. *See Stansbury v. California*, 511 U.S. 318, 325
> (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if
> they are conveyed, by word or deed, to the individual being questioned.");
> *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974) (same). The Third
> Circuit has stated than officer will be more likely than not to "bear down" during
> an interrogation of a suspect the officer believes committed a crime. *Steingler*,
> 496 F.2d at 799 ("The more cause for believing the suspect committed the
> crime, the greater tendency to bear down in interrogation and create the kind
> of atmosphere of significant restraint that triggers *Miranda*." (quoting *United
> States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969))); *see also Jacobs*, 431 F.3d
> at 105. Thus, when an officer begins an interrogation believing a suspect had
> committed the crime at issue, the likelihood that the suspect is in custody also
> increases. *Id.*

*United States v. Aker*, 2018 WL 501001, at *7 (M.D.Pa. Jan. 22, 2018); *see also Mathiason*,

429 U.S. at 495 ("[P]olice officers are not required to administer Miranda warnings to

everyone whom they question. Nor is the requirement of warnings to be imposed simply

because … the questioned person is one whom the police suspect."); *Leese*, 176 F.3d at

744 (quoting *Mathiason*, 429 at 495).

Here, Agent Jacobi testified that he and Agent Smart "had a suspicion that Mr.

Hutchinson violated the law" because there were "enough items to warrant looking into

[Defendant's firearm purchases] further." (Doc. 78 at 37-38). After Defendant provided his

initial explanation for his multiple gun purchases in a short window of time, the agents

confronted him with skepticism about his story. (Interview Transcript at 31-43; Doc. 78 at

43-44). It is fair to say that as the interrogation continued, the agents, especially Agent

Jacobi, "[bore] down in interrogation" and became more confrontational in their manner of

questioning. *Leese*, 176 F.3d at 744 ("However, '[t]he more cause for believing the suspect

committed the crime, the greater tendency to bear down in interrogation and to create the

kind of atmosphere of significant restraint that triggers Miranda … But this is simply one

circumstance, to be weighed with all the others.'" (quoting *Steigler*, 496 F.2d at 799-800)).

This additional factor weighs in favor of finding the interrogation confrontational. This,

however, is but one of many factors for the Court to weigh in considering whether

Defendant was in custody during the interrogation with Agent Jacobi and Agent Smart. *See

id*; *United States v. Taylor*, 22 F.Supp.3d 387, 392 (M.D.Pa. 2014) (finding no evidence of

coercive tactics even though officers "did ask Defendant confrontational questions").

Looking at the *Willaman* factors in conjunction with the fact that the agents viewed

Defendant as a suspect, the Court finds that Defendant was not in custody during the April

11, 2019, interrogation with ATF agents. Defendant was repeatedly told he was not under arrest and that he would not be going with the agents at the end of the interrogation, Defendant was not physically restrained or confined to the vehicle with handcuffs or locked doors, and Defendant voluntarily walked to the agents' vehicle with the understanding that he would be questioned about his recent gun purchases. A reasonable person under these circumstances would have felt free to exit the agents' unlocked vehicle and reenter his home without answering any further questions, or to deny the agents' request to speak to him altogether. The facts here do not demonstrate that Defendant was subject to the same inherently coercive pressures as if he were arrested and interrogated at the police station. Therefore, Defendant was not in custody for purposes of *Miranda* and Agent Jacobi and Agent Smart were not required to advise him of the *Miranda* rights.

## IV. CONCLUSION

For the aforementioned reasons, the Court will deny Defendant's Motion to Suppress Evidence from Statement (Doc. 65). A separate Order will follow.

Robert D. Mariani
United States District Judge